### UNITED STATES of America, Plaintiff–Appellee,

v.

### Marshall GILMORE, also known as Marshall Kidd, Defendant–Appellant.

### No. 95–1551.

United States Court of Appeals, Seventh Circuit.

Argued June 13, 1995.

Decided July 26, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 12, 1995.

Barry Rand Elden, Asst. U.S. Atty., Diane Saltoun (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

John A. Meyer, Chicago, IL (argued), for Marshall Gilmore.

Before POSNER, Chief Judge, and CUMMINGS and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

One section of the federal sentencing guidelines provides, so far as bears on this case, that the sentence of a person who commits a federal firearms offense shall be increased if he "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(5). The increase brought the defendant in this case, Gilmore, from a guidelines level of 22, which has a sentencing range of 46 to 57 months, to a level 26, where the sentencing

range is 70 to 87 months; and the judge sentenced him to 72 months. The question for decision is, Can this section ever apply when the defendant *loses* a gun that is later used in connection with a felony?

Between February of 1991 and June of 1994 Gilmore bought at least 25 firearms from gun stores, concealing the fact that he was a felon and thus forbidden to own a gun. Thirteen of the firearms were later recovered by the police, mostly from members of the Blackstones (a Chicago street gang in whose territory Gilmore lived) in circumstances in which it was plain that the guns had been, were being, or were about to be used in connection with felonious conduct. Because the government did not succeed in persuading any of the persons from whom Gilmore's guns had been seized to tell it how they had obtained the guns—whether by purchase or gift or stealing from him or finding them in the street or otherwise—the district judge refused to infer, as the government asked him to do, that Gilmore had sold or given any of the guns to the Blackstones in whose hands they were found. The judge accepted Gilmore's position, fantastic as it seems, that all the guns had either been lost or stolen. The judge should not have believed Gilmore; the circumstantial evidence that Gilmore was buying the guns to give or resell them to gang members was overwhelming. But while rejecting this evidence, the judge held that the guideline that we have quoted was applicable after all because Gilmore was an "excessively negligent person" with regard to guns, who, "knowing his own proclivity for losing them," had "reason to believe that when he purchased each firearm, it would be used or possessed in connection with another felony."

This case is unusual because it is neither acknowledged, as in *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir.1994), nor inferred by the district judge, as in *United States v. Rogers*, 46 F.3d 31, 33 (7th Cir.1995) (per curiam), that the defendant sold any of the guns. Surely, argues the defendant, the "transfer" to which the guideline refers is voluntary; and surely, he adds, the guideline is not intended to punish merely negligent conduct. He is probably right that "trans-fer" should be confined to voluntary transfers, such as sales, loans, and gifts. Imagine a case in which someone's gun was stolen by an obviously violent criminal, with the consequence that the owner had "reason to believe" that the gun would be used in connection with another felony. It would make little sense to punish the owner for his violation of the firearms laws more heavily than if the gun had not been stolen from him, at least if he had taken proper precautions to avoid the theft.

But this reasoning does not let Gilmore off the hook. The guideline does not say "transferred any firearm ... with ... reason to believe" that it would be used in a felony. It says *"possessed or transferred any firearm ... with ... reason to believe"* that it would be used in a felony. Before Gilmore's guns were lost or stolen, they were possessed, knowingly of course, by him. After some number (unnecessary to specify) of them had been lost or stolen, he knew that the next was quite likely to be lost or stolen too. Gilmore lost guns the way the rest of us lose pens. We know that our current pen is quite likely to be lost eventually, and Gilmore knew the same about each of his current guns after the first few were "lost" (if they were, as we are assuming without believing). Gilmore's lawyer argues that a loss is accidental, and accidents cannot be anticipated. What is true is that the exact time and date of an accident usually cannot be anticipated, for if it could be then it would be easy to prevent the accident from occurring. But such precision of prevision is not required to make an accident or, as here, a loss foreseeable. It is enough that a string of losses gives rise to a general anticipation that future losses are quite likely to occur, though when, where, and how may be unclear.

Not only did Gilmore know that he was prone to lose guns; he also knew that the finders or thieves were in all likelihood using them in criminal activity. He knew, therefore, that there was a high probability that the next gun he bought would eventually be used in another felony. Yet he went on buying—buying and possessing, with the state of mind required by the guideline.

Granted, the only hard evidence that Gilmore knew that his guns would be used in felonies is that one of them was found on his cousin, who was selling narcotics from the Gilmore family home. Gilmore lost ten guns after that; had the incident with his cousin placed him on notice of the likelihood that some of these would end up in the hands of other felons? We think that it did (or more precisely that the district judge did not commit clear error in finding that it did), for there was evidence that Gilmore himself was a gang member, lived in an area infested by gangs, and was in the narcotics business, where guns are frequently used.

We have assumed thus far that "reason to believe" is something of which the defendant is conscious, rather than, as in the tort law of negligence, something of which a reasonable person would be conscious whether or not *this* person, who may have a defective understanding, is conscious of it. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32, pp. 173–75 (5th ed. 1984). Most of the cases assume so, though without discussion of the point. See, e.g., *United States v. Pantelakis*, 58 F.3d 567 (10th Cir.1995); *United States v. Cutler, supra*, 36 F.3d at 408; *United States v. Brewster*, 1 F.3d 51 (1st Cir.1993). We need not decide. Gilmore knew that the guns he was buying and losing would be used to commit crimes. This knowledge, whether or not actually required by section 2K2.1(b)(5), brought him securely within the grasp of that guideline.

AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

This is a very straight-forward failure of proof case. The government had the burden of showing that the defendant had reason to believe that the firearms he possessed would be used in criminal activity. It simply never proved what it had alleged. The consequences in such a situation present no great question of law: the government simply loses on the point it did not prove. End of case.