In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1936 and 99-1979

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KELLY JEMISON and DONIAL CARTER,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 98 CR 50037--Philip G. Reinhard, Judge.

Argued September 6, 2000--Decided January 24, 2001

Before CUDAHY, COFFEY, RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.  On July 30, 1998, the
United States Attorney for the Northern District
of Illinois filed a criminal information charging
the defendants-appellants Donial Carter and Kelly
Jemison each with one count of conspiring to make
false statements in an application for the
purchase of firearms from a federally licensed
firearms dealer, in violation of 18 U.S.C. sec.
371, and three counts of causing false statements
to be made in the records of a federally licensed
firearms dealer, in violation of 18 U.S.C. sec.
924(a)(1)(A).

On December 22, 1998, Jemison pled guilty to
Count One of the information (conspiracy to make
a false statement in an application for the
purchase of a firearm from a federally licenced
firearms dealer) and the other three counts
charged were dismissed pursuant to a plea
agreement. At Jemison's March 31, 1999 sentencing
hearing, the trial judge sentenced her to 16
months of imprisonment, three years of supervised
release, and a special assessment of $100. Carter
pled guilty to all four counts of the indictment
on March 31, 1999. At Carter's April 8, 1999
sentencing hearing, the trial judge ordered him
imprisoned for a period of 66 months on each of
the four counts with each of his sentences to run
concurrent with each other, three years of

supervised release, a $500 fine, and a $400 special assessment. On appeal, Jemison argues that she received ineffective assistance of counsel. Carter argues: (1) that the sentencing court committed clear error in increasing his base offense level by four points pursuant to U.S.S.G. sec. 2K2.1(b)(5) for attempting to transfer firearms with reason to believe that those firearms would be used in connection with felony offenses; and (2) that the court erred in sentencing him to four concurrent terms of imprisonment of 66 months each when the statutory maximum term of imprisonment for each count was only 60 months. We affirm as to Jemison. As to Carter, we affirm in part, reverse in part, and remand for re-sentencing.

I.  BACKGROUND
A.  The Crimes

On November 29, 1997, Donial Carter went to the Shootin' Shack gun shop in Rockford, Illinois, and ordered two nine-millimeter pistols. Mike Douglas, the owner of the gun store, called the Illinois State Police's Firearm Transfer Inquiry Program ("FTIP") and gave Carter's Illinois Firearms Owners Identification Card ("FOID") number for approval to purchase the weapons and the FTIP refused to approve the gun sale to Carter based upon an outstanding arrest warrant./1 Due to the FTIP's failure to approve the transaction, Douglas declined to make the sale to Carter.

After being refused the opportunity to purchase the pistols, Carter contacted his half-sister, Kelly Jemison, who had a valid Illinois FOID, and requested that she purchase the firearms for him. Jemison agreed, and on December 6, 1997, she accompanied Carter to the gun store and executed a Bureau of Alcohol, Tobacco, and Firearms ("ATF") Form 4473 for the purchase of two firearms, including one of the pistols Carter previously had attempted to purchase in November. In response to the question on the gun sale form asking "Are you the actual buyer of the firearm indicated below?" Jemison answered "Yes." Neither Jemison nor Carter contests that her answer on the application was false and, in fact, Jemison subsequently admitted, in a signed statement to the police, that she was purchasing the weapons for Carter.

Just one month later, on February 5, 1998, Jemison again accompanied Carter to the gun shop and purchased a nine-millimeter pistol. Jemison again executed an ATF Form 4473 in which she answered "Yes" to the question "Are you the actual buyer of the firearm indicated below?" when in fact she was acting as a "strawman" in

purchasing the guns for Carter, who in turn re-sold the nine-millimeter pistol./2

On June 12, 1998, Carter called Douglas at the gun store and stated that he wished to purchase 10 Lorcine nine-millimeter pistols. After being quoted a price of $110 per pistol, Carter informed Douglas that it was his intention to re-sell these ten guns for a profit. Although Carter did not disclose the identity of the prospective gun buyers to Douglas, he did admit later to the police that he planned to sell the guns to members of the Gangster Disciples, a nationally known street gang. Douglas advised Carter that it would be illegal to re-sell the pistols without a federal firearms dealer's license. Later that day, Carter and Jemison spoke with Douglas on a conference call, and informed him that Jemison would purchase the ten pistols because he (Carter) still did not possess a valid FOID. Douglas advised Carter and Jemison that their plan constituted an illegal "straw purchase." In spite of this information, Carter told Douglas that he wanted to go through with the purchase of the pistols through Jemison. After their discussion, Douglas notified ATF about the pending gun sale to Jemison for Carter and agreed to cooperate in an investigation of the illegal transaction.

On June 24, 1998, Carter visited the Shootin' Shack and, during a tape-recorded conversation, told Douglas that he intended to take possession of the pistols that Jemison was purchasing from him and sell them to buyers in Chicago. Carter also informed Douglas that in the future he intended to buy about $1,000 worth of guns from him per week for re-sale purposes. Carter left the gun store without making any down-payment on the pistols. Later that day, Carter called to confirm that Jemison would return and make the actual purchase and pick up the weapons. During this telephone conversation, Carter mentioned that he would be re-selling the firearms to buyers living in the Chicago, Illinois, area.

On July 2, 1998, Carter arrived at the store in a car with one other passenger, identified as Tommy Davidson, a member of the Gangster Disciples. Unbeknownst to Carter and Jemison, not only was their trip surveilled by ATF agents, but their conversation in the Shootin' Shack was recorded. Carter and Jemison counted out $1062 in cash for the ten guns, and Carter handed the money to Douglas. After the sale, Carter requested that Douglas prepare a false sales receipt in the amount of $1867.51 to facilitate his charging an inflated price for the guns. Carter left the store carrying the box containing the pistols. He and Davidson stashed nine of the

guns in the trunk of their vehicle, and placed the other pistol on the console between them on the front seat. When Jemison exited the store with the phony receipt, she and Carter were arrested and taken into custody.

B.  The Confessions

After their arrest, Jemison and Carter were conveyed to the Rockford Public Safety Building (police station) and questioned. Jemison initially stated that she was a gun collector and had purchased the ten pistols for her personal use, but later recanted this fabrication and, in a signed confession, admitted that she had purchased the guns for Carter. Her statement reads:

3 weeks ago Donial called me and asked me if I wanted to make some money and he was going to pay $300.00 using my FOID card. He used my number to order guns at the Shooting Shack in Rockford and told me only that I had to sign gun forms. . . . Donial never paid me the money and (sic) he said he was, and I did not know what he was doing with the guns. No clue.

Carter also initially stated that the guns were purchased for Jemison's private use as a collector. Later, he also retracted that story and admitted in a signed confession that he was purchasing the guns for a Gangster Disciple named "Will" who had directed that Tommy Davidson accompany Carter and observe the transaction. Carter told the police:

I ran into Will after being jumped by some Urban Lord gang members and I talked to him about being protected because he was a G.D. [Gangster Disciple] and we came to a (sic) agreement that if I could find him some guns that he could help me be protected from the gang members. So last week I came to see Mike Douglas about it and he told me that he would order the guns under my sister's name [as I requested.] . . . [Will] gave Tommy the money to ride with me to purchase the guns because he didn't trust me with the money.

C.  Jemison's Plea Agreement and Sentencing

In Jemison's negotiated plea agreement, the government agreed not to pursue the two-level enhancement set forth in the United States Sentencing Guideline 3B1.1/3 and in return Jemison consented to waive her right to appeal either her conviction or sentence. The appellate waiver clause stated:

Defendant understands that by pleading guilty she is waiving all the rights set forth in the

prior paragraph. Defendant's attorney has explained those rights to her and the consequences of waiving all appellate issues that might have been available if she had exercised her right to trial. The defendant is also aware that Title 18, United States Code, Section 3742 affords defendant a right to appeal the sentence imposed. Acknowledging all of this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or manner in which that sentence was determined) on the grounds set forth in section 3742 or on any other ground whatsoever, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives her right to challenge her sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255.

On December 22, 1998, Jemison and her attorney, Mark Danielson, signed the agreement which averred that they had read the entire plea document, including the appellate waiver provision. Jemison subsequently entered a plea of guilty to Count One of the information (conspiracy to make a false statement in an application for the purchase of a firearm from a federally licenced firearms dealer) and the other three counts charged were dismissed pursuant to the plea agreement. The court, after interrogating her as to the voluntariness of her plea and knowledge of the plea agreement, accepted her plea, ordered a pre-sentence report, and continued her sentencing hearing to March 31, 1998.

At Jemison's sentencing hearing, defense counsel moved for a continuance and informed the court he had been advised by his client at the start of the hearing that, for reasons not set forth in the record, she was attempting to hire new counsel. In support thereof, Jemison went on and asserted that she had already hired new counsel. The court, after questioning her, found Jemison's claim of newly retained counsel to be implausible given the fact that no other attorney had either filed a written notice of substitution of counsel nor was a substitute attorney present in court for the scheduled sentencing hearing. The trial judge denied her motion for a continuance and proceeded with the hearing and sentenced her to 16 months' imprisonment./4 Carrying out the terms of the plea agreement, the prosecution did not request (and the court did not apply) enhancements to Jemison's sentence. Jemison appeals her conviction and sentence, apparently/5 arguing that her counsel was somehow ineffective in: (1) failing to file pre-

trial motions attacking unspecified "violations of her Fourth and Fifth Amendment Rights," and (2) failing to file a motion requesting the he be allowed to withdraw prior to her sentencing hearing based upon a "break-down" in communications between counsel and Jemison.

D. Carter's Sentencing

On December 22, 1998, Carter appeared before the sentencing judge and entered a plea of guilty to Counts One through Four of the information./6 The trial judge, after interrogating Carter and satisfying himself that the plea was being entered knowingly and voluntarily, found Carter guilty and ordered a Presentence Investigation Report ("PSR"). The PSR recommended that Carter's offense level be increased four levels under U.S.S.G. sec. 2K2.1(b)(5) since Carter purchased the firearms with the intent to transfer them to another while having "reason to believe" those firearms would be used in connection with the commission of a felony offense./7 Carter objected to this enhancement, arguing that just because he had knowledge that the guns were being purchased by gang members did not give him reason to believe that the weapons would be used in a future felony.

The trial judge rejected this argument and stated:

He knew that the Gangster Disciples, as a Gang, that they are engaged in all sorts of illegal activity. It's well known the Gangster Disciples gang is engaged in felony drug offenses and other crimes of violence and shootings that are felony offenses and that they are using weapons for illegal purposes. It would just be naive of me to say that under the facts, well, you have to show that even though he knew they were being provided to a gang, he really didn't know what they were going to be used for. I think that that would be an unreasonable assumption and that he knew that they were going to be used for felony offenses.

II. ISSUES

On appeal, Jemison argues that she received ineffective assistance of counsel. Carter argues that: (1) the district court committed clear error in enhancing his offense level four levels pursuant to U.S.S.G. sec. 2K2.1(b)(5) for attempting to transfer firearms with "reason to believe" that those weapons would be used in connection with a future felony offense; and (2) that the district court erred in sentencing him to concurrent terms of 66 months when the statutory maximum term of imprisonment on each count was only 60 months.

III.  ANALYSIS

A. Waiver of Jemison's Ineffective Assistance of Counsel Claim

On appeal, Jemison broadly asserts that she received ineffective assistance of counsel in violation of her Sixth Amendment rights, but fails to set forth particulars as to how her counsel was ineffective. If we hold that she has entered into a binding appellate waiver, we need not address the merits of her claim of ineffective assistance of counsel as we "have routinely held that a defendant may waive the right to a direct appeal as part of a written plea agreement."/8 Jones v. United States, 167 F.3d 1142, 1144 (7th Cir. 1999).

1.  Enforceability of the Appellate Waiver

As previously stated, both Jemison and her attorney, Mark Danielson, knowingly and voluntarily signed the plea agreement and averred that they had read the plea document, including the appellate waiver provision. Thereafter, Jemison entered a plea of guilty on December 22, 1998 which was accepted by the court. The appellate waiver clause in Jemison's plea agreement explicitly stated:

Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to her and the consequences of waiving all appellate issues that might have been available if she had exercised her right to trial. The defendant is also aware that Title 18, United States Code, Section 3742 affords defendant a right to appeal the sentence imposed. Acknowledging all of this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or manner in which that sentence was determined) on the grounds set forth in section 3742 or on any other ground whatsoever, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives her right to challenge her sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255.

An appellate waiver will be enforced if: (1) its terms are clear and unambiguous; and (2) the record demonstrates that it was entered into "knowingly and voluntarily." Jones, 167 F.3d at 1144. We are convinced that the appellate waiver set forth in Jemison's plea agreement fulfills

these requirements. Furthermore, we note that we have previously enforced an appellate waiver identical to the waiver language contained in Jemison's plea agreement. United States v. Williams, 184 F.3d 666, 667-68 (7th Cir. 1999). In Williams, we found that the terms of the waiver, as in this case, constituted an "express and unambiguous" waiver. Id. Second, we believe that Jemison's testimony before an Illinois state court judge at her December 22, 1998, sentencing hearing clearly illustrates that she "knowingly and voluntarily" entered into and accepted the appellate waiver terms of the plea agreement. At that hearing, the following colloquy took place:

THE COURT: You have seen this plea agreement?
MS. JEMISON: Yes, I have.
THE COURT: And you have read it?
MS. JEMISON: Yes.
THE COURT: And you have discussed it with your lawyer?
MS. JEMISON: Yes.
THE COURT: And you understand it?
MS. JEMISON: Yes.
THE COURT: Did anybody force you to sign it either physically or mentally?
MS. JEMISON: No.

The prosecution then recited for the record the evidence that would have been introduced at trial had Jemison not entered a plea of guilty, including the fact that Jemison had falsely filled out multiple ATF Form 4473's when she knew Carter's FOID card was invalid during the time period that she was making the firearms purchases. Jemison also admitted that she was told by Carter that she would be paid to make the purchases, allowing the factfinder to conclude that she knew the illegality of the gun-buying scheme and the assistance she was providing in its furtherance. Furthermore, she conceded that she had been less then truthful when telling the police that she was a firearms collector when she was well aware that she was acting as a "strawman" for Carter and making firearms purchases because he did not possess a valid FOID. When asked if she had committed the acts set forth by the prosecution in its offer of proof, Jemison answered "Correct." Following Jemison's admission, the trial judge advised her that she was giving up her Constitutional rights (including, but not limited to the right to a trial by jury, the right to appointed counsel, and the right to examine the prosecution's witnesses and present her own witnesses) by entering into the plea agreement. The district court also carefully explained in basic terms the effect that the appellate waiver would have on Jemison's guilty plea:

THE COURT:  Normally you would have the right when you plead guilty to appeal the sentence or appeal the sentencing procedures or any error that I might make today in the plea of guilty proceedings, but in your plea agreement you have agreed that you are not going to take an appeal at all or any other form of action to go to a higher court to try to ultimately overturn what I may rule in this case to be your sentence or any other matter that I may rule on. Do you understand that?

MS. JEMISON: Yes.

THE COURT: The essence is that I'm the last judge in your case, and you ordinarily would have a right to go to a higher judge. Do you understand that?

MS. JEMISON: Yes.

THE COURT: And you have discussed that with your lawyer?

MS. JEMISON: Yes.

THE COURT: And you understand. I take it you think that's in your best interest, is that correct?

MS. JEMISON: Correct.

THE COURT: Now, I have explained to you all your rights, and you say that you understand them. Do you wish to give them up and plead guilty?

MS. JEMISON: Yes.

Based upon the facts set forth in the record, including the admissions and statements made by Jemison in open court, we are convinced that she knowingly and voluntarily entered into an enforceable appellate waiver whose terms were clear and unambiguous. Jemison's appeal is dismissed.

B. Carter's Objection to his Sentencing Enhancement

United States Sentencing Guideline Section 2K2.1(b)(5) authorizes an increase in the base offense level in firearms offenses if the defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. sec. 2K2.1 (b)(5). Carter argues (in order that it might benefit his own situation) that the sentencing court should have interpreted section 2K2.1(b)(5) so that the mere transfer of multiple firearms to a street gang, in and of itself, is insufficient for a court to hold that he had "reason to believe" such weapons would be used in felonious activities. Essentially Carter asserts that the guideline requires the prosecution to establish that he had "reason to believe" that the pistols would be used in a specific offense in the future. We review the district court's

finding at sentencing that Carter attempted to "transfer" firearms with "reason to believe they would be used in connection with other felonies" for clear error. United States v. Purchess, 107 F.3d 1261, 1265 (7th Cir. 1997).

We have previously affirmed imposing an increased penalty under section 2K2.1(b)(5) for defendants whose actions have resulted in multiple gang members illegally coming into the possession of firearms. United States v. Gilmore, 60 F.3d 392 (7th Cir. 1995); United States v. Messino, 55 F.3d 1241 (7th Cir. 1995). Based upon our review, we are convinced that Carter knew or possessed good "reason to believe" that any firearms he purchased and in turn re-sold to members of the Gangster Disciples would in all probability be used in connection with felonious activities. Unlike the defendant-appellant in Gilmore, Carter admitted that he intended to provide firearms to members of a street gang, specifically the Gangster Disciples. The Gangster Disciples, of course, are an infamous nationwide criminal organization based in Chicago, Illinois, whose far-ranging illegal activities have in the past included the sale of illicit drugs under terms often negotiated and enforced, literally, at gunpoint. See United States v. Smith, 223 F.3d 554 (7th Cir. 2000). We are well aware that judges and the public are not blissfully ignorant of the connection between criminal violence and street gangs. See United States v. Sargent, 98 F.3d 325, 328 (7th Cir. 1996). Like the trial judge stated, we believe it would be "naive" for either the trial court or this court to conclude that Carter never had any reason to believe that the firearms he supplied to the Gangster Disciples would be used in the commission of future felonies.

C. Carter's Objection to Being Sentenced to 66 Months of Imprisonment

Carter argues, the government concedes, and we agree that the district court erred in sentencing him to concurrent terms of 66 months when the statutory maximum term of imprisonment was limited to 60 months on each of the four counts of his conviction. See United States v. Joetski, 952 F.2d 1090, 1098 (9th Cir. 1991). While the trial judge obviously could have sentenced Carter to 66 months (and a great deal more) if he would have imposed consecutive sentences, his order specifically directs that Carter's sentences are to run concurrently with one another. The procedure for sentencing on multiple counts of conviction is set forth at U.S.S.G. sec. 5G1.2. Section 5G1.2(d) states:

If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

We remand Carter's case to the district court for re-sentencing, requesting that the sentencing court make clear whether it intended to either: (1) sentence Carter utilizing consecutive sentences under U.S.S.G. sec. 5G1.2(d); or (2) sentence him to 60 months imprisonment on all four counts, with each sentence to run concurrent with each other. Id.

IV.  CONCLUSION

We hold that Jemison knowingly and voluntarily entered into a written plea agreement that contained a clear and unambiguous appellate waiver clause that clearly recited that she was forfeiting her rights to contest either her conviction or sentence and we accordingly DISMISS her appeal. We are convinced that Carter knew, or at the very least, had "reason to believe" that the firearms he was attempting to sell to members of the Gangster Disciples would be used for felonious offenses, thus we AFFIRM the district court's imposition of a U.S.S.G. sec. 2K2.1(b)(5) sentencing enhancement as to his sentence. Finally, as stated earlier, we agree that the district court erred in imposing upon Carter a sentence (66 months) in excess of that allowed under the applicable sentencing guidelines (60 months).

The decision of the district court is AFFIRMED in part, REVERSED in part and REMANDED to the district court for sentencing in conformance with U.S.S.G. sec. 5G1.2(d) and this opinion.

/1 Any purchaser of a firearm in Illinois must possess a valid Firearms Owners Identification Card ("FOID"). Illinois Firearms dealers are required to notify the Illinois State Police's Firearm Transfer Inquiry Program ("FTIP") prior to making any weapons sale. FTIP performs a criminal background check on the prospective purchaser using the buyer's FOID number given to the dealer. If the prospective buyer has any felony convictions or outstanding arrest warrants, FTIP must decline approval of the sale and the dealer is notified that he is legally prohibited from selling any firearms to the

prospective purchaser. Carter's denial was based upon an outstanding Kane County, Illinois, arrest warrant for domestic battery.

/2 A gun sale wherein an individual who is authorized to purchase firearms from a licensed Federal Firearms Dealer buys weapons for another person who is not legally eligible to purchase and/or possess a firearm is referred to as a "straw purchase."

/3 Pursuant to United States Sentencing Guideline 3B1.1, if a defendant was an organizer, leader, manager or supervisor of any criminal activity, a two-level enhancement should be applied.

/4 Jemison's original counsel continued to represent her at sentencing after the court denied the motion for a continuance.

/5 As detailed below, in her appellate brief Jemison failed to develop either a factual basis or legal reasoning for any claim of relief.

/6 No written plea agreement was entered.

/7 U.S.S.G. sec. 2K2.1(b)(5) authorizes an increase to the base offense level for a defendant convicted of a firearms offense where the defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."

/8 We have previously recognized that a valid appellate waiver, though binding in other respects, does not preclude judicial review of a criminal defendant's assertion that her plea agreement was itself the product of ineffective assistance of counsel. United States v. Joiner, 183 F.3d 635, 645 (7th Cir. 1999). As Jemison has neither argued that her appellate waiver was the product of ineffective assistance of counsel nor set forth facts illustrating that her attorney was deficient in negotiating her plea agreement, we proceed with an analysis of the validity of her appellate waiver. Jones, 167 F.3d at 1146.