UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued September 12, 2006
Decided September 26, 2006

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-3927

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| v. | No.  03 CR 318 |
| DARRYL MOODY, *Defendant-Appellant*. | Joan B. Gottschall, *Judge* |

**O R D E R**

A jury found Darryl Moody guilty of four firearms offenses after he was caught in Chicago trying to sell a machine gun he stole in Mississippi. On appeal he argues only that the district court erred by applying a four-level upward adjustment under U.S.S.G. § 2K2.1(b)(5) upon finding that Moody had reason to believe the firearm he attempted to sell would be used in connection with another felony offense. Moody has failed to establish that the district court's finding is clearly erroneous. We affirm.

**I.**

On March 24, 2003, Moody—who was visiting Chicago from Hattiesburg, Mississippi—telephoned Timothy Hinton, the brother of Moody's friend Krishanna

Hinton, and invited him to an apartment near 51st Street and Drexel Boulevard. When Hinton arrived, Moody explained that Krishanna had given him Hinton's phone number and told him her brother "would be able to help them with something." Moody then showed Hinton a Heckler and Koch, Model MP-5 submachine gun and offered to sell it for $5,000. Moody told Hinton that, in the past, he "would buy" guns in Mississippi and supply them to gang members in Chicago. Hinton, who by then had realized that the meeting had nothing to do with his sister, extricated himself from the situation by telling Moody that "this is something that my guys are looking for." Hinton then left, ostensibly to find a buyer. Instead he immediately called a friend at the suburban Riverdale Police Department and reported the incident.

The next day Hinton met with officers from Riverdale, who referred him to the Illinois State Police. Hinton took one of the state troopers to see the apartment where the attempted sale had taken place. During that time, Hinton received a phone call from Moody, who wanted to know why Hinton was taking so long to find a buyer.

Based on Hinton's information, a state judge issued a search warrant for the apartment where Moody was staying and storing the weapon. Later that day, officers from the Illinois State Police Tactical Response team executed the search warrant and found the gun on a couch as Moody attempted to hide it under a jacket. Officers also located ammunition for the gun in the apartment. Moody was arrested along with DeShawn Davis and DeShawn McBride, who had accompanied him from Mississippi, and Jeffrey Bullock, the lessee of the apartment.

Once in custody Moody agreed to speak to the police officers that had issued the *Miranda* warnings. His admissions were memorialized in a written, signed statement that was prepared by one of the officers. Moody admitted that he and another individual had stolen four automatic weapons from the Big Shot Indoor Shooting Range in Hattiesburg. Moody retained two guns: the Heckler and Koch submachine gun and a Glock machine pistol, which he later sold for $700 and an ounce of cocaine. Moody hoped to sell the submachine gun in Chicago while he, Davis, and McBride were there to promote their rap group. He wanted to sell the gun for at least $3,000 because he "heard people in Chicago could afford it." In Chicago he stayed at the apartment of Jeffrey Bullock, whom he described as a "friend." In a written statement, Bullock admitted that Moody was staying at his apartment and had asked him to "call some of the people I know to try and sell the gun." Bullock later admitted to law enforcement officials that he is a member of the Gangster Disciples street gang.

Moody was charged with (1) possession of a firearm by a felon, 18 U.S.C. § 922(g)(1); (2) possession of a machine gun, *id.* § 922(o)(1); (3) transport of a

machine gun, *id.* § 922(a)(4); and (4) transport of a stolen firearm, *id.* § 922(i). A jury found him guilty on all counts after a four-day trial. A presentence investigation report (PSR) was prepared addressing, in relevant part, whether Moody's base offense level should be adjusted under U.S.S.G. § 2K2.1(b)(5), which calls for a four-level increase in the defendant's offense level if he "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."

In a memorandum filed before sentencing, the government took the position that Moody qualified for the increase under either prong, contending that he possessed the weapon "in connection with" the burglary of the Mississippi gun shop, and that he had "reason to believe" another felony would be committed with the gun because he intended to sell it to a known gang member and knew he wasn't going to use the weapon to brush his teeth or chase flies off a manure pile. In support of the latter theory, the government cited the evidence that Moody stayed with Jeffrey Bullock—a member of the Gangster Disciples—in Chicago and had asked Bullock to contact "some of the people he knew" to find a buyer. It further noted that Moody had told Hinton that he sold guns he obtained in Mississippi to gang members in Chicago. The government also observed that Moody had concluded from his interaction with Hinton that Hinton was acting as a middleman for "his guys": presumably, gang members. In response, Moody contested the applicability of the adjustment, arguing that he did not possess the machine gun "in connection" with stealing it. He also contended that he had no reason to believe he was transferring the gun to someone who would possess or use it in connection with another felony, challenging the sufficiency of the government's evidence that he intended to sell the gun to gang members.

At the sentencing hearing, the district court again heard from both parties regarding the applicability of the adjustment. The court rejected the government's theory that Moody himself possessed the weapon in connection with another felony offense, but the court was persuaded that the government had demonstrated, by a preponderance of the evidence, that Moody had reason to believe the weapon would be used in another felony. Citing our decision in *United States v. Jemison*, 237 F.3d 911 (7th Cir. 2001), the district court noted that having the intent to sell a firearm to gang members amounts to having "reason to believe" the weapon will be used in another felony offense. The district court opined that the evidence of a connection to gang activity "was not quite as clear as it was in *Jemison*," but cited as an additional basis for the adjustment the fact that "we've got an illegally obtained, stolen machine gun which Mr. Moody is trying to sell to somebody under circumstances that could not possibly be legal." The court added: "[N]obody is going to buy a gun like this in these circumstances for legal purposes." The court applied

the adjustment over Moody's objection. After resolving the remaining objections, the district court arrived at an advisory guidelines range of 97 to 121 months. The court imposed a sentence of 100 months' imprisonment.

## II.

Moody contends that the district court erred in finding he had reason to believe the machine gun would be used in another felony because there was no evidence that he knew anything about the potential buyer, such as his gang affiliation, or had any other reason to think the buyer would commit a crime with the gun. Whether a defendant had reason to believe a firearm would be used or possessed in connection with another felony is a factual determination reviewed for clear error. *United States v. Inglese,* 282 F.3d 528, 539 (7th Cir. 2002)*; see United States v. Howard*, 454 F.3d 700, 702 (7th Cir. 2006) (explaining clear error review of factual determinations at sentencing).

To show that a defendant had reason to believe that a firearm "would be used or possessed in connection with another felony offense," the government need not establish that the defendant had reason to believe the gun would be used in connection with any *particular* felony. *Inglese,* 282 F.3d at 539; *Jemison*, 237 F.3d at 918. In *Jemison,* we held that a defendant who intends to provide firearms to a street gang—the Gangster Disciples in Jemison's case—has "good" reason to believe that the guns "would in all probability be used in connection with felonious activities." 237 F.3d at 918. And in *Inglese*, we upheld the district court's finding that the defendant had the necessary reason to believe that "at least one of the guns he sold" would be put to felonious use where the buyers (undercover police officers) had made statements to the effect that they planned to shoot people. 282 F.3d at 539. We deemed it "irrelevant" that the district court did not make any findings about "whether Inglese knew which guns would be used to commit which felonies." *Id.* Moody stresses that in his case, there is only a tenuous connection to gang activity compared to *Jemison*, and unlike in *Inglese*, the potential buyer did not explicitly reveal a plan to use the gun to commit a crime.[*] But Moody's narrow reading of those cases is unpersuasive.

In reviewing the application of § 2K2.1(b)(5) to apply we look to the totality of the circumstances. We have upheld the application of the adjustment where the district court stated it was drawing "a reasonable inference" that the defendant had

---

[*] Mere possession of the automatic weapon Moody was selling is a crime, *see* 18 U.S.C. § 922(o)(1), but the reference to "another offense" in § 2K2.1(b)(5) means an offense "other than . . . firearms possession or trafficking offenses." U.S.S.G. § 2K2.1, cmt. n.15.

reason to believe that of the 59 (mostly semi-automatic) guns he bought in less than two years, some would wind up being possessed in connection with other felonies. *See United States v. Rogers*, 46 F.3d 31, 32-33 (7th Cir. 1995). The district court in *Rogers* cited the "nature of the guns" and the "amount of the guns" as factors supporting the inference that the defendant was not buying guns for "sport usage, collection, and self-defense." *Id.* at 33. In affirming, we emphasized that the guideline does not require "knowledge," but simply "reason to believe" the gun would be used or possessed in connection with another felony. *See id.* Moody attempts to distinguish his case from *Rogers* based on evidence in that case that 16 weapons purchased by the defendant had later been used in felonies. But the government need not prove that the weapons were ever used in another crime; the guideline focuses entirely on the defendant's state of mind at the time of the transfer, or in this case, the attempted transfer.

Other courts also have emphasized the importance of considering the totality of the circumstances and making common-sense inferences based on the evidence when determining whether an adjustment under § 2K2.1(b)(5) is warranted. In *United States v. Caldwell*, 448 F.3d 287, 292 (5th Cir. 2006), the court noted that although "no direct evidence conclusively establishes [the defendant's] understanding of the future use of the firearms, the sentencing court is permitted to make common-sense inferences from the circumstantial evidence." In that case, the defendant had sold guns—on the street and at a substantial markup—with partially obliterated serial numbers to suspects "involved in narcotics trade." *Id.* at 291. Similarly, the First Circuit upheld the application of the adjustment where the defendant sold an assault rifle to an undercover government agent, considering such factors as "the nature of the weapon, the clandestine nature of the sale," and the inflated price. *United States v. Tavares*, 427 F.3d 122, 125 (1st Cir. 2005). The court also took notice of an intermediary's statements suggesting that the buyer was "ready to shoot" certain people he "got beef" with. *Id.* at 125-26.

Turning to the circumstances of this case, the district court did not commit error in finding that Moody attempted to transfer the submachine gun with reason to believe it would be used in another felony. First, the district court's inference that the weapon would probably wind up in the hands of gang members was sound. Moody attempted to use a Gangster Disciple as a broker for the gun when he asked Bullock to help him find a buyer. Moody also told Hinton he brought guns from Mississippi to Chicago to sell them to gang members. And as far as Moody knew, Hinton wanted the machine gun for "one of his guys." Taken together, these facts support the district court's conclusion that Moody had reason to believe the machine gun would end up in the hands of the Gangster Disciples, and as we noted in *Jemison*, it would be naive of us to ignore the connection between "criminal violence and street gangs." 237 F.3d at 918.

Second, the district court inferred from the nature of the weapon and the proposed sale that no purchaser would want the machine gun for legal purposes. We cannot quarrel with this common-sense appraisal, and it squares with the absence of any requirement that the defendant had reason to believe that the gun would be possessed or used in connection with a specific felony. *See Inglese,* 282 F.3d at 539; *Jemison*, 237 F.3d at 918. Moody argues that other scenarios—such as a buyer using the machine gun for target practice—are equally likely, but the mere existence of an alternative theory cannot support a finding of clear error. *See Howard*, 454 F.3d at 703 (explaining that district court does not commit clear error when it chooses "one of two permissible views of the evidence").

## III.

The totality of the circumstances—the link to the Gangster Disciples, Moody's statement to Hinton, the nature of the attempted sale, and the type of weapon—support the district court's finding that Moody had reason to believe that the gun would be used for criminal purposes. Accordingly, we uphold the district court's application of § 2K2.1(b)(5).

AFFIRMED.