In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1967

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TOMMY M. MARTINEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98-CR-40088--G. Patrick Murphy, Chief Judge.

ARGUED April 19, 2001--DECIDED July 12, 2001


   Before FLAUM, Chief Judge, and HARLINGTON
WOOD, JR., and ROVNER, Circuit Judges.

   HARLINGTON WOOD, JR., Circuit Judge.  On
August 13, 1998, a federal grand jury
returned an eight-count indictment
charging the defendant, Tommy M.
Martinez, and seven co-defendants with
conspiracy to distribute crack cocaine
("Count I") and distribution of crack
cocaine ("Count II"), in violation of 21
U.S.C. sec.sec. 841(a)(1) and 846. All
seven co-defendants pled guilty to the
charges and agreed to cooperate with the
government, but Martinez elected to go to
trial before a jury. On January 13, 2000,
a jury convicted Martinez on both counts.
He was later sentenced to a term of life
imprisonment on Count I and 240 months
imprisonment on Count II. Martinez
appeals the sentence. He contends that in
light of the Supreme Court's decision in
Apprendi v. New Jersey, 530 U.S. 466
(2000), his conviction should be reversed
or, alternatively, his case should be
remanded for re-sentencing. We have
jurisdiction under 18 U.S.C. sec. 3741
and 28 U.S.C. sec. 1291, and we affirm
the district court's sentence.

I.  BACKGROUND

   Beginning in May 1996, a joint
investigation was undertaken by the FBI
and other law enforcement agencies
participating in the Carbondale-

Murphysboro (Ill.) Violent Crime Initiative. The investigation focused on the distribution of crack cocaine ("crack") in the Murphysboro, Illinois area. As a result of the investigation, the matter was taken before a grand jury and an indictment was returned for Martinez and his associates. The indictment contained charges for conspiracy to distribute crack and distribution of crack. However, it did not allege the quantities of crack involved.

The underlying facts of this case detail a crack distribution conspiracy that lasted from approximately 1995 to 1998. Martinez and four of his co-defendants, Justin Green, Willie Johnson, Adrian Harris, and Sheridan Johnson, lived in Sparta, Illinois. They were principal distributors of crack in Murphysboro and Sparta. Occasionally, Martinez and his associates traveled from Sparta to Murphysboro in order to sell the crack. Generally, they traveled to Murphysboro during the first week of the month when public aid checks were received.

Although Martinez was occasionally known to obtain the crack from other sources, co-defendant Tony Gladney was his main source. Each month Gladney traveled to East St. Louis and purchased multiple ounces of powder cocaine. He then cooked the powder into crack and sold it to various individuals. At trial, Gladney testified that Martinez was a good customer. According to Gladney, he sold crack to Martinez at least once a month from July 1995 to July 1998. He stated that Martinez had bought multiple ounces of crack at a price of $1000 per ounce.

At Martinez's trial, Willie Johnson testified that he was involved in crack distribution with Martinez. He stated that Martinez was the leader of the group while he was second in command. Johnson also testified that even though Martinez would usually buy the drugs from Gladney, he (Johnson) would sometimes make the purchase for Martinez. After obtaining the crack, Martinez and Johnson would often front "eight balls"/1 and quarter ounces to co-conspirators Harris, Green, and Sheridan Johnson. On a less regular basis, Martinez would front crack to sellers outside his immediate circle. After selling the crack that Martinez had

fronted, both his co-conspirators and other sellers would pay Martinez a specified amount of money determined by the quantity of crack given to them.

On May 7, 1998, Chris Swope, a confidential informant working with the FBI, was sent out to make a controlled buy from Martinez. The FBI had fitted Swope with a body recorder and given him $250 to purchase crack from Martinez. Swope went to an apartment complex and met with Martinez, Willie Johnson, and Green. Swope asked Green to sell him an eight ball, but Green said he had to talk to Martinez first. Green and Martinez went into an apartment and when they emerged Martinez handed a bag to Green, who in turn handed it to Swope. Swope paid $200 to Green, who subsequently handed the money to Martinez. This exchange led to the Count II distribution charge against Martinez. An audio tape recording of this transaction was submitted as evidence at trial. On August 13, 1998, Martinez surrendered to police at the Sparta Police Department after word was left with his girlfriend and mother that there was a warrant for his arrest.

Martinez's trial began on January 11, 2000. At trial, numerous witnesses testified to having seen Martinez in possession of varying amounts of crack. Gladney testified that he occasionally sold Martinez several ounces/2 of crack but had supplied Martinez with at least one ounce of crack every month for a two-and-one-half-year period. Maurice Johnson testified that on one occasion he saw Martinez purchase four to five ounces of crack from Gladney. He also testified that Martinez fronted him from one-eighth to one-half ounce of crack every week for approximately two years. Green testified that he observed Martinez with three-and-one-half ounces of crack between five and seven times. Also, Green stated that he had seen Martinez with approximately one ounce of crack on five or six different occasions. Additionally, Green testified that he had seen Willie Johnson with an ounce of crack at least twenty times, but Green knew that the crack in Johnson's possession belonged to Martinez. Frank Williams testified that he once saw Martinez with approximately three ounces of crack. Although Sheridan Johnson testified that he had only seen Martinez

with crack on six to eight occasions, he stated that on the few times he accompanied Martinez on the drive from Sparta to Murphysboro, Martinez would have approximately two ounces of crack on him. Harris testified that he had obtained quarter-ounce amounts of crack from Martinez every two weeks for close to one year. He further testified that he had seen Martinez with approximately three ounces of crack on one occasion. Willie Johnson testified that from mid-1995 to mid-1998 he and Martinez had purchased multiple ounces of crack from Gladney on a regular basis and on two or three occasions had purchased half ounces from Gladney's brother.

Martinez called three witnesses to testify on his behalf: Calvin Hinton, Camika Penny, and Amy Collins. All three witnesses testified that they had overheard Swope after he testified at trial, stating that it was not Martinez on the FBI's tape recording but Sheridan Johnson. They claimed they heard Swope say that the government told him to say it was Martinez. They also testified that they had never seen Martinez in possession of any amount of crack.

However, during the government's cross-examination of Hinton, he admitted telling FBI agents that he had not only seen Martinez with crack, but had purchased crack from Martinez. Hinton also stated that on the same day that he had received the subpoena to testify at trial he spoke to Martinez on the telephone and Martinez had asked Hinton if he was going to testify. Although Hinton stated at trial that he did not feel threatened by Martinez, FBI Agent Bob Dueker testified that Hinton had previously told him that he had felt threatened by Martinez's call.

On January 13, 2000, the jury convicted Martinez on both counts. However, the jury was not requested to and did not return a verdict which reflected any determined amount of crack. Following the conviction, the district court ordered the Probation Office to prepare a Pre-Sentence Investigation Report ("PSR"). The Probation Officer calculated that the relevant amount of crack distributed by Martinez during the conspiracy was 9.23 kilograms of crack. This determination was made based on the proffer interviews

of Willie Johnson, Gladney, Green, and Williams. Because Martinez was being sentenced under the United States Sentencing Guidelines ("U.S.S.G." or the "guidelines"), the PSR concluded that for guideline purposes Martinez was responsible for 1.5 kilograms or more of cocaine base in the form of crack. The recommended guideline range, as determined by the PSR, was mandatory life imprisonment based on Martinez's Offense Level 43 and Criminal History Category I. Martinez's attorney filed no objections to the PSR.

During the sentencing hearing on April 7, 2000, the district court asked Martinez and his counsel if they had any objections to the PSR. Defense counsel maintained that she had no objections which would affect the guideline range. The government made one objection to the PSR, stating that there should be a two-level sentence enhancement for obstruction of justice pursuant to U.S.S.G. sec. 3C1.1. The objection was based on Martinez's attempt to intimidate Hinton. The district court granted the enhancement, but because Martinez's sentencing range was mandatory life imprisonment, the two-level increase did not affect Martinez's sentence. Adopting the recommendations of the PSR, the district court sentenced Martinez to life imprisonment on Count I and 240 months on Count II. Martinez filed this timely appeal based solely on the Supreme Court's decision in Apprendi.

II. ANALYSIS

Martinez contends that this court must reconsider his conviction and sentence in light of the Supreme Court's holding in Apprendi. He states that because he was sentenced above the statutory maximum for a drug offense without a jury determination of the quantity of drugsinvolved in the offense his conviction should be reversed or his case should be remanded for re-sentencing. In Apprendi, the Supreme Court held that any fact other than a prior conviction that increases the penalty for an offense beyond the statutory maximum for that offense is an element of the crime and must be submitted to the jury and proved beyond a reasonable doubt. 530 U.S. at 491.

Martinez was sentenced to a mandatory life sentence on the basis of the district court's determination that Martinez was responsible for 1.5 kilograms or more of crack during the conspiracy. However, under 21 U.S.C. sec. 841(a)(1)(C), the maximum penalty which may be imposed for an offense that does not specify a quantity of drugs involved is twenty years. Because the jury did not determine the quantity of the drugs involved in the crime, Martinez's life sentence is in direct conflict with the holding in Apprendi. See United States v. Nance, 236 F.3d 820, 824-25 (7th Cir. 2000), petition for cert. filed (U.S. Apr. 24, 2001) (No. 00-9633).

However, we have held that when the defendant does not object to the indictment's failure to state the drug quantity nor does he ask the court to submit the question of drug quantity to the jury, our review is for plain error. Nance, 236 F.3d at 824. In review for plain error, "we must decide (1) whether there was an error at all, (2) whether it was plain, (3) whether it affected the defendant's substantial rights, and (4) whether (if the first three factors are present) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." Id. (citing Johnson v. United States, 520 U.S. 461, 466-67 (1997)). In the instant case, we concede that the district court's decision not to submit the question of drug quantity to the jury was an error, thereby meeting the first prong of plain error review. Under the second prong, current law after Apprendi is clear that the question of drug quantity must be submitted to the jury, thus the error is sufficiently plain. In satisfying the third prong, the error substantially affected Martinez's rights by increasing his sentence from twenty years to life imprisonment.

Although the error in the instant case meets the first three prongs of plain error review, a reversal is not always required in such cases. United States v. Patterson, 241 F.3d 912, 913 (7th Cir. 2001), petition for cert. filed (U.S. May 30, 2001) (No. 00-10365). In analyzing the fourth prong of the test, "[u]nless the error also causes a miscarriage of justice, in the sense of 'seriously affecting the fairness, integrity or

public reputation of judicial proceedings,' a court of appeals retains discretion to affirm the judgment." Id. (quoting United States v. Olano, 507 U.S. 725, 736 (1993) and Johnson, 520 U.S. at 469). In Johnson, the Supreme Court held that overwhelming evidence of guilt makes it difficult to demonstrate a miscarriage of justice which justifies a reversal on the basis of the error. 520 U.S. at 470. In the same sense, when there is overwhelming evidence presented as to the minimum quantity of drugs necessary to sustain the sentence imposed, we have found that the error is not so serious that it requires us to set aside the judgment. See Patterson, 241 F.3d at 913-14.

Under 21 U.S.C. sec. 841(b)(1)(A)(iii), a person who distributes, or conspires to distribute, a mixture or substance weighing more than 50 grams/3 and containing a detectable quantity of cocaine base ("crack") may be sentenced to life imprisonment. We must determine whether the evidence here was so overwhelming that any reasonable jury would have been bound to conclude that Martinez's conspiracy and drug activity involved more than 50 grams. See Patterson, 241 F.3d at 914. At sentencing, the district court determined the amount of drugs attributed to Martinez which constituted his relevant conduct was 1.5 kilograms or more of crack. The PSR determined Martinez's relevant conduct was 9.23 kilograms,/4 nearly 200 times the amount necessary to sustain a life sentence, but reduced this figure to 1.5 kilograms or more for guideline purposes. The testimony of Gladney, Martinez's main supplier of crack (but not his only source as testimony indicated at trial), places Martinez in possession of a minimum of 30 ounces (850.5 grams) of crack. In addition, there were numerous witnesses who testified to having seen Martinez with varying amounts of crack. Given the duration and scope of Martinez's organization, the evidence was overwhelming that the amount of crack was far beyond 50 grams. See id. No reasonable jury could conclude that the conspiracy involved under 50 grams of crack. Therefore, because the evidence was more than sufficient to show an amount of crack which would allow for a life sentence, the error did not seriously affect the public integrity,

fairness, or reputation of these proceedings, and we will not upset the verdict on plain error review.

Martinez also argues that because the indictment did not allege any quantity of crack, it failed to allege an essential element of the offense, and therefore, his conviction should be reversed and the indictment dismissed. However, that fact does not affect our analysis. See Patterson, 241 F.3d at 914. On plain error review, "once the court concludes that the evidence was so strong that a petit jury was bound to find[ ] that a particular drug and quantity was involved, we can be confident in retrospect that the grand jury (which acts under a lower burden of persuasion) would have reached the same conclusion." Id. Because no reasonable jury could have decided that Martinez had distributed less than 50 grams of crack, there was no need for the indictment to allege a specific quantity of drugs.

## III. CONCLUSION

For the above stated reasons, we AFFIRM the judgment of the district court.

FOOTNOTES

/1 According to FBI Agent Brenn Tallent who testified at trial, one-eighth ounce of crack is typically referred to as an "eight ball" and weighs 3.5 grams.

/2 One ounce is equivalent to 28.35 grams. The American Heritage College Dictionary 968 (3d ed. 1993).

/3 One thousand grams is equivalent to one kilogram. The American Heritage College Dictionary 747.

/4 As noted, this estimate was based on information from several proffers. However, these proffers were not admitted into evidence at trial.