In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3710

United States of America,

Plaintiff-Appellee,

v.

Macario Viezca,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 671--Blanche M. Manning, Judge.

Argued June 8, 2001--Decided September 7, 2001


   Before Bauer, Easterbrook, and Kanne,
Circuit Judges.

   Kanne, Circuit Judge.  Macario Viezca was
convicted by a jury of conspiring to
possess, with the intent to distribute,
cocaine. He now appeals, alleging that:
(1) the government presented insufficient
evidence to support his conviction; (2)
the district court improperly failed to
provide the jury with a Sears
instruction; and (3) the district court
erred by denying his motion for a new
trial based upon juror bias. Because we
find no reversible error among these
claims, we affirm Viezca's conviction.

I.  History

   On November 5, 1996, Terry Albrecht, a
convicted felon who was cooperating with
the Federal Bureau of Investigation,
contacted Viezca to set up a meeting.
Albrecht and Viezca had met in 1995
through a common acquaintance, Yolanda
Estrada. Viezca agreed to meet with
Albrecht at a local restaurant. At the
meeting, Albrecht told Viezca that his
nephews were interested in selling drugs.
Viezca asked Albrecht what he was looking
for, and Albrecht indicated he was
interested in purchasing an ounce of
cocaine. Viezca responded to this by
telling Albrecht that he would set him up
with his brother, Ronald Mendoza. Viezca

also told Albrecht that he did not "do shit right now," suggesting that he was not currently dealing drugs, but he reiterated that he would "hook" Albrecht up with his brother. Viezca then used Albrecht's cellular telephone to call his brother. While waiting for his brother to return his call, Viezca confirmed that Albrecht was interested in purchasing an ounce of cocaine. Albrecht agreed and indicated that he was also interested in becoming a regular customer of Viezca's.

Viezca eventually spoke with his brother and explained by way of a series of previously established code words in Spanish that Albrecht was interested in buying an ounce of cocaine. He also told his brother to come to the restaurant to talk with Albrecht, that Albrecht wanted to make a purchase that day, and that he was interested in becoming a regular customer. After this conversation, Viezca and Albrecht discussed how they would finalize the purchase and they agreed that Albrecht would call Viezca later that day. Viezca then left the restaurant, and Albrecht waited for Mendoza to arrive.

Mendoza arrived at the restaurant later that evening. He approached Albrecht and stated that "Gallo," Viezca's nickname, told him to come to the restaurant. Albrecht indicated that he was the man Mendoza was looking for and the two men then began to discuss the specifics of the drug purchase. Mendoza inquired as to the quantity Albrecht wanted to purchase, and Albrecht indicated that he wanted to purchase an ounce of cocaine. Mendoza explained that he only had 1/16 of an ounce of cocaine on his person because he believed that the Spanish word his brother had communicated to him, "camisa," was code for this amount of cocaine. During this discussion, Viezca called Albrecht on his cellular telephone and Albrecht let him speak with Mendoza. After Mendoza finished his conversation with Viezca, Albrecht asked him whether Viezca was going to return to the restaurant. Mendoza responded that he was not, "just as long as we're straight." Albrecht then inquired as to how much an ounce of cocaine would cost. Mendoza explained that although he usually charged "nine" (nine hundred dollars), "since it's for my brother I'd go eight-fifty." Mendoza told Albrecht that he

would leave the restaurant for a period of time but that he would return.

Mendoza later returned to the restaurant in a pick-up truck. Albrecht got into the truck and they drove around the surrounding neighborhood. Mendoza produced a plastic bag containing 28.1 grams of cocaine, which he gave to Albrecht in exchange for the agreed upon amount of money. Mendoza then dropped Albrecht off at the restaurant.

In February of 1997, Albrecht contacted Viezca by attending a party being held for Viezca's son at a neighborhood establishment. Although the two men talked at the party, no discussion pertaining to drugs occurred at that time. Albrecht did, however, indicate that he would call Viezca sometime in the near future. Several days later, Albrecht tried to contact Viezca by using the pager number Viezca had given to him. After several unsuccessful attempts, Albrecht contacted Mendoza, telling him that he had been trying to get in touch with Viezca "to get another camisa." Mendoza informed Albrecht that Viezca had changed his pager number. Mendoza gave Albrecht new contact information for Viezca and Albrecht gave Mendoza his telephone number. Mendoza indicated that he would give Albrecht's number to his brother.

The next day, Albrecht paged Viezca and Viezca returned his page. Albrecht expressed his interest in obtaining another "camisa." Viezca told Albrecht to contact him the following day. Albrecht did not contact Viezca the next day or immediately thereafter because federal agents took possession of the cellular telephone Albrecht had been using for approximately three weeks. Albrecht did contact Viezca on March 6, however, and Viezca told Albrecht that he had been trying to contact Albrecht, but that no one was answering his telephone. Viezca asked Albrecht if he was interested in stopping by to see Viezca that night, informing Albrecht that he would be at a local club. Albrecht indicated that he would try to meet him, but that if he could not make it that night, that he would meet with him the next evening. Viezca made sure that Albrecht wanted to "talk, right?" Albrecht agreed, and Viezca told him to page him. Albrecht did

not meet or call Viezca that evening.

The next evening Albrecht paged Viezca. Viezca returned the page, wondering where Albrecht had been the previous night and indicating that he had been expecting Albrecht to meet him. Albrecht provided several excuses and then asked Viezca if he was free to meet that night. Viezcaexplained that he was not really free, but he confirmed that Albrecht was interested in setting up another cocaine purchase. Viezca told Albrecht to call Mendoza and gave him  Mendoza's number. Viezca also agreed to call Mendoza to make the purchase easier. Albrecht tried unsuccessfully to contact Mendoza and thereafter called Viezca asking him to let Mendoza know that he was trying to reach him. Viezca agreed to call his brother right away and give him Albrecht's telephone number. After he had not heard from Mendoza for a period of time that evening, Albrecht again paged and subsequently spoke with Viezca. Viezca told Albrecht that he would speak with his brother and that Albrecht should wait for Mendoza's phone call. Shortly after Albrecht hung up with Viezca, Mendoza called Albrecht. The two men arranged the details of another drug purchase to take place at a local restaurant.

Albrecht went to the restaurant he and Mendoza had agreed upon. Mendoza was not there; however, Sammy Guerrero showed up in his place. Unfamiliar with Guerrero, Albrecht asked him if he knew Gallo. Guerrero responded affirmatively and identified himself as Mendoza's nephew. The two men proceeded to get into the car Guerrero had driven to the restaurant. Having seen police officers in the restaurant, the two men drove away from the restaurant, and Guerrero gave Albrecht 27.8 grams of cocaine in exchange for $850.00.

In April of 1997, Albrecht again contacted Viezca. He explained that he had tried to communicate with Mendoza about another purchase, but that he had not been able to get in touch with him. Viezca indicated that there were no drugs available to be purchased, but when Albrecht told him that Mendoza directed him to call him that day, Viezca agreed to talk with his brother. Viezca later contacted Albrecht and confirmed that a

purchase was not possible at that time. However, he told Albrecht to call him later that week to see if the situation had changed.

Viezca, Mendoza, and Guerrero were all subsequently arrested and indicted in a three-count indictment. Count one of that indictment charged Viezca, along with Mendoza and Guerrero, with conspiring to possess with the intent to distribute cocaine in violation of 21 U.S.C. sec. 846. The indictment alleged that, on two separate occasions, quantities of cocaine were delivered to an individual as a result of the conspiracy. Mendoza and Guerrero both pleaded guilty; however, Viezca pleaded not guilty and was tried and convicted by a jury. Because of prior felony convictions, the district court determined that Viezca was a career offender, and subsequently sentenced him to 262 months imprisonment. He now appeals.

## II.  Analysis

### A.  Sufficiency of the Evidence

Viezca's first claim on appeal alleges that the evidence produced at trial was insufficient to support his conviction for conspiring to possess with the intent to distribute cocaine in violation of 21 U.S.C. sec. 846. We have explained that "a defendant who attacks the legal sufficiency of the evidence supporting a conviction faces a nearly insurmountable burden." United States v. Phillips, 239 F.3d 829, 842 (7th Cir. 2001) (quotation omitted). In reviewing Viezca's claim, we view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor. See United States v. Gardner, 238 F.3d 878, 879 (7th Cir. 2001). Additionally, we will overturn the jury's verdict "only if the record contains no evidence from which the jury could have found guilt beyond a reasonable doubt." United States v. Jefferson, 252 F.3d 937, 942 (7th Cir. 2001) (quotation omitted).

To prove that Viezca was a part of a conspiracy, the government had to demonstrate that a conspiracy existed and that Viezca knowingly agreed to join it. See United States v. Albarran, 233 F.3d 972, 976 (7th Cir. 2000) (explaining that the government must "show that there is

substantial evidence that the particular defendant in question knew of the illegal objective of the conspiracy and agreed to participate in its achievement.") (quotation omitted). The government may prove these elements entirely by way of circumstantial evidence. See United States v. Pagan, 196 F.3d 884, 889 (7th Cir. 2000) ("All that is necessary is enough circumstantial evidence to support, beyond reasonable doubt, an inference that the defendants agreed among themselves to distribute drugs.") (quotation omitted). Furthermore, the requisite agreement between co-conspirators need not be explicit and no overt act is required. See United States v. Sanchez, 251 F.3d 598, 601 (7th Cir. 2001) ("[I]n the murky world of illicit drugs, conspiracies are, by necessity, loosely-knit associations.").

   Viezca contends that the evidence presented by the government at his trial established nothing more than the fact that he was an intermediary between a willing buyer, Terry Albrecht, and a willing seller, Ronald Mendoza. Alternatively, Viezca argues that the only possible conspiracy established by the government's evidence was one between himself and Albrecht, but that because Albrecht was acting as a government agent, no such conspiracy is legally recognizable. We do not agree with either of these arguments.

   From the initial meeting between Viezca and Albrecht in November of 1996, to their final conversation in April of 1997, Viezca's role exceeded that of simply bringing together a buyer and seller of cocaine. Despite Viezca's comment at the initial meeting that he "did not do shit right now," the evidence collected from the extensive government surveillance conducted in this case demonstrated to the jury that Viezca made repeated efforts to establish, maintain, and facilitate what he and his brother both thought would be a long term illegal business relationship with Albrecht. Thus, we find that there was sufficient evidence for the jury to conclude that Viezca and Mendoza forged an agreement to distribute cocaine to Albrecht, and that therefore, Viezca was guilty of conspiring to possess with the intent to distribute cocaine.

B.  Sears Instruction

   In his second claim, Viezca argues that the district court should have provided the jury with a Sears instruction to inform the jury that Terry Albrecht could not be a conspirator because he acted in cooperation with the government. He further contends that based on the evidence presented at trial, the district court's failure to sua sponte instruct the jury that Albrecht could not be a bona fide co-conspirator constitutes reversible error. Because Viezca neither requested such an instruction nor objected to the lack of such an instruction during his trial, our review of the district court's decision not to provide the jury with this instruction is for plain error. See Fed. R. Crim. P. 52(b). Therefore, "we must decide (1) whether there was an error at all, (2) whether it was plain, (3) whether it affected the defendant's substantial rights, and (4) whether (if the first three factors are present) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." United States v. Martinez, No. 00-1967, 2001 WL 783739, at *4 (7th Cir. July 12, 2001) (quotation omitted).

   In Sears v. United States, 343 F.2d 139 (5th Cir. 1965), the Fifth Circuit reversed a portion of Sears' conviction because it found that the district court had committed error by refusing to instruct the jury that it could not find him guilty of conspiracy if the only agreement it found him to have entered into was one by which he unknowingly agreed to assist with the illegal activities of a government informant who secretly intended to frustrate the conspiracy. Id. The court explained that such an instruction should have been given by the district court because "[i]n view of the posture of the evidence and the charge actually given by the court, the jury may well have actually believed that it could convict Sears simply by believing that he agreed with [the government informant] and accepted bribes from him." Id. at 142.

   This court has subsequently cited Sears for the proposition that "an agreement with an agent of the police is not a criminal conspiracy." United States v. Duff, 76 F.3d 122, 127 (7th Cir. 1996).

In Duff, this court concluded that the district court erred in denying the request of one of the defendants that an instruction be given to the jury explaining that a government informant could not be considered to be a bona fide conspirator. 76 F.2d at 127. In reaching this conclusion, we found that the wording of the indictment, which "alleged that the 17 defendants 'did knowinglyconspire together and with diverse other persons known and unknown to the Grand Jury,'" left open the possibility that the informant could have been one of these "diverse other persons known and unknown to the Grand Jury." Id. Additionally, we observed that the informant's "drug transactions with the defendants played a prominent role in the trial." Id. Thus, we found that the defendant was "entitled to have the jury told in no uncertain terms, that, if the sole agreement into which [the defendant] entered was with [the informant] then [the defendant] had to be acquitted of conspiracy." Id. at 127. We found this error to be harmless, however, because trial testimony indicated that the defendant was an active supervisor of the relevant drug organization, whereas the informant was a newcomer to the organization who had to be shown the basics of the drug trade. See id. at 127-28. Thus, we concluded that "no reasonable jury would have thought that [the defendant] agreed only with [the informant]." Id. at 128. Accordingly, since "the omission of the instruction . . . did not matter," we simply noted that "it should be given the next time a similar situation crops up." Id. Viezca now contends that the present case is that next time this court referred to in Duff.

We agree with Viezca that there are similarities between this case and Duff. Portions of Count one of the indictment in this case were worded much like the indictment in Duff, as it charged Viezca, Mendoza, and Guerrero with having "conspired and agreed with each other, and with others known and unknown to the Grand Jury, knowingly and intentionally to possess with intent to distribute cocaine." Additionally, as in Duff, the communications and interaction between Viezca and Albrecht, the government informant in this case, played a significant role in Viezca's trial. We

find an important difference in this case, however, that persuades us to conclude that the absence of a Sears instruction was not improper. From the district court's initial description of the case to the venire, to the closing arguments of both the government and Viezca's attorney, Viezca's three-day trial focused on the sole issue of whether Viezca entered into an agreement with Mendoza and Guerrero to supply Albrecht with cocaine on an ongoing basis. Furthermore, unlike in Sears and Duff, the evidence presented at the trial did not necessitate that a Sears instruction be given to the jury. Although Viezca's communications and interactions with Albrecht were presented to the jury, they were introduced to the jury in the specific context of demonstrating Viezca's knowing agreement with Mendoza to distribute cocaine to Albrecht. Thus, we find that no reasonable jury could have concluded that Viezca agreed with Albrecht alone. Therefore, we conclude that the district court's decision not to provide the jury sua sponte with a Sears instruction did not constitute an error, much less a plain error requiring reversal of Viezca's conviction.

## C.   Potential Juror Bias

Viezca's final claim on appeal challenges the district court's denial of his motion for a new trial based on juror bias. He argues that the district court should have granted this motion because one of the jurors lied during voir dire about his father's legal problems. We review the district court's denial of Viezca's motion for an abuse of discretion. See United States v. Wilson, 237 F.3d 827, 831-32 (7th Cir. 2001). In reviewing the district court's decision, we must accept the court's findings unless they are clearly erroneous. See United States v. Pigee, 197 F.3d 879, 888 (7th Cir. 1999).

Jury selection in this case began with the district court clerk calling a group of twenty-one individuals including Jess Gill. The court posed general questions to the entire group, followed by a series of additional questions put to each individual. Among the court's questions to Gill was the following inquiry:

The Court: Okay. Have you, a member of

your family, or any close friends ever been arrested for any criminal offenses other than minor traffic violations?

Juror Gill: No.

Tr. at 67-69. Both parties accepted Gill as a juror, and he was later chosen to be the foreperson of the jury. After the jury convicted Viezca, the government learned that Juror Gill's father had been charged in 1996 with making false statements in connection with loan and credit reports in violation of 18 U.S.C. sec. 1014, and failing to file tax returns in violation of 26 U.S.C. sec. 7203. Juror Gill's father pleaded guilty to these charges and was sentenced to twelve months' incarceration. Because of health problems, however, his report date to begin serving his sentence had been delayed, and he had not yet reported to federal authorities as of September 22, 2000--the date of the hearing at which the district court considered Viezca's motion for a new trial. It was also subsequently discovered that Juror Gill's father had been arrested on two previous occasions: once in 1967 and once in 1980.

The district court considered Viezca's motion for a new trial at the September 22, 2000 hearing. In considering this motion, the court questioned Juror Gill regarding his answer to the court's inquiry as to whether he or anyone in his family had ever been convicted of a criminal offense other than a minor traffic violation. Gill explained that he knew his father had visited the Dirksen Federal Building, and that he had legal problems, more specifically a tax problem, but he stated that he did not think that it was a criminal problem and therefore "didn't attach that to a conviction or an arrest." He further indicated that he was not aware of his father's other arrests, and that his father had only told him after he served on the jury at Viezca's trial that he had actually been convicted of a crime. After concluding its inquiry, the court gave the government and Viezca's attorney the opportunity to question Juror Gill. The government also produced a copy of the Pre-Sentencing Report compiled in connection with the offenses Juror Gill's father pleaded guilty to in 1996. This report indicated that the father specifically asked the probation officer

not to contact his family members and that he had not told his sons at that point about his criminal problems. After listening to Juror Gill's testimony and the respective arguments proffered by the government and Viezca's attorney, the court made the following findings:

[W]e've had Mr. Gill testify here today before this Court. You each had an opportunity to also inquire of him. I've looked at Mr. Gill as I inquired of him and as you inquired of him. I watched him. I looked in his face. I looked at his demeanor. I am totally convinced by the manner in which he testified that he is telling the truth. I believe that he did not know that his father had, in fact, been criminally prosecuted. Notwithstanding that that question wasn't even asked, I frankly believe that, and it is definitely supported by the probation report which reveals it. That report was prepared long before this occurred, and it reveals that [Juror Gill's father] specifically requested that his sons not be made of aware [sic] the fact that he had, in fact, been convicted of this criminal offense. So I think the evidence is overwhelming that he is telling the truth, that he did not lie when he was inquired of during voir dire.

Tr. at 28-29. The court then considered Viezca's motion in the context of the analysis articulated by the Supreme Court in McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) ("We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."). The court denied the motion, noting that it had already found that Juror Gill answered the questions at voir dire truthfully. The court further commented that, because Viezca had accepted a person as a juror who had been convicted in a court-martial proceeding, it did not think that knowing about Juror Gill's father would have made a difference in the jury selection process.

In reaching her decision to deny Viezca's motion, Judge Manning reviewed all of the available information describ

ing the circumstances surrounding Juror Gill's father, as well as the exact questions posed to Juror Gill at theoriginal voir dire and his answers. Furthermore, at the September 22 hearing, Judge Manning specifically questioned Juror Gill about the extent of his knowledge regarding his father's legal troubles and she carefully observed both Juror Gill's statements in response to these questions as well as his demeanor in answering. Accordingly, although the situation involving Juror Gill was indeed peculiar, our review of the court's findings leaves us confident that Juror Gill answered each question put to him at the initial jury selection process in a forthright and honest manner and that, therefore, a new trial is not warranted. See McDonough Power Equip., Inc., 464 U.S. at 556. Thus, because we find that Judge Manning's findings of fact were not clearly erroneous, and that she did not abuse her discretion in denying Viezca's motion for a new trial, we will set aside this claim.

III. Conclusion

For the aforementioned reasons, we AFFIRM Viezca's conviction.