In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1203

United States of America,

Plaintiff-Appellee,

v.

Brian L. Inglese and Earl F. Baumhardt, Jr.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 611--George M. Marovich, Judge.

Argued September 28, 2001--Decided March 8, 2002


   Before Posner, Easterbrook, and Kanne,
Circuit Judges.

   Kanne, Circuit Judge.  Defendants Brian
Inglese and Earl Baumhardt were convicted
of firearm offenses pursuant to 18 U.S.C.
secs. 2 and 1001(a)(3). The district
court sentenced Inglese to 30 months
imprisonment and Baumhardt to 15 months
imprisonment. Defendants appeal and we
affirm.

I.  History

   A.  Background

   In 1998, both Inglese and Baumhardt
worked at B & H Sports, Ltd., a
federally-licensed gun store in Oak Park,
Illinois. During that time, Illinois law
required individuals to obtain a
Firearms' Owner's Identification ("FOID")
card in order to purchase guns from a gun
store such as B & H. Some individuals,
such as convicted felons, were barred
from obtaining FOID cards. In addition,
Illinois law required there to be a
waiting period between the time the
customer ordered the gun and the time the
customer took possession of the gun.
During the waiting period, the gun shop
was required to run a background check on
the customer to determine whether the
customer possessed a valid FOID card and
had ever been convicted of a felony.
Federal law required gun shops to record

the customer data and results of the background check in an Acquisition and Disposition Book ("A & D Book").

People without FOID cards were able to circumvent Illinois law and obtain firearms through "straw purchases." That is the purchase of a firearm by one individual (the "straw purchaser") on behalf of another individual (the "actual buyer"). This allowed the actual buyer to obtain a gun even though he was legally barred from buying one. When a customer ordered a gun at B & H, a store employee would create a sales receipt containing the customer's information and the transaction details and would run a background check on that customer. If the transaction was a straw purchase, however, the sales receipt would show the straw purchaser's information and the background check would be on the straw purchaser, rather than on the actual buyer.

After the background check was run and the waiting period had passed, the customer would return to B & H to pick up his gun. A store employee would then use the sales receipt to create an ATF firearms transaction form ("ATF Form") and to complete the A & D Book entry. The customer would fill out the top of the ATF Form, providing personal information and averring that he was the actual buyer. Each B & H gun transaction, therefore, would consist of two parts. The first part consisted of the customer agreeing to purchase a gun and of the store employee creating a sales receipt (the "front-end"). The second part consisted of the customer taking possession of the gun and filling out the ATF Form and of the store employee signing the ATF Form and completing the A & D Book entry (the "back-end").

With a straw purchase, the information on the sales receipt would cause the ATF Form and the A & D Book entry to contain false entries. The false entries prevented the ATF from determining whether convicted felons were purchasing guns and made it impossible to trace a gun to the actual buyer.

In an effort to stop these illegal gun purchases from occurring, the City of Chicago initiated "Operation Gunsmoke," a sting operation where Chicago Police

officers would assume fake identities, obtain fake FOID cards corresponding with the assumed identities, and make straw purchases at gun shops. While at the gun shops, the officers would make statements and behave in a manner that would indicate that they were engaging in straw purchases. Thus, if a gun shop sold a gun to a Chicago Police officer, it could be charged with violating federal law (knowingly creating false ATF Forms and A & D Book entries) and with violating state law (knowingly selling a gun to an actual buyer without an FOID card).

On twelve occasions between August 10 and November 9, 1998, Chicago Police officers visited B & H as part of their sting operation. The police officers purchased twenty-five guns from B & H during these visits. As a result of these alleged straw purchases, a grand jury returned a multiple-count superceding indictment against B & H, Inglese, and Baumhardt. For every alleged straw purchase, the indictment contained two counts. One count charged B & H and the respective store employee with "knowingly and willfully ma[king] and us[ing], and caus[ing] to be made and used, false writings and documents knowing that they contained materially false, fictitious, and fraudulent statements and entries" in violation of 18 U.S.C. secs. 2 and 1001(a)(3)./1 The other count charged B & H with knowingly delivering a gun to an individual in violation of state law pursuant to 18 U.S.C. sec. 922(b)(2) and charged the respective store employee with aiding and abetting this violation./2 Inglese was charged with participating in four straw purchases, and Baumhardt was charged with participating in two straw purchases. In addition, the indictment charged B & H and Inglese with three counts of knowingly transferring guns that were going to be used to commit a drug trafficking crime, in violation of 18 U.S.C. sec. 924(h) ("drug trafficking counts").

B.  The Trial

At the joint trial, the government's first witness was Chicago Police Officer Ron Korzeniewski, who testified to the following: On August 10, 1998, while on undercover duty, he went to B & H and portrayed himself as "Ronald Czaja."

While there, Inglese offered to sell him two 9-millimeter handguns. Officer Korzeniewski then presented Inglese with his FOID card, which bore the name "Ronald Czaja." Officer Korzeniewski told Inglese that he lost his previous handgun while running from the police, but that he had never been convicted of a felony. He also told Inglese, "I think I figured out who ratted me out to the cops where I lost my 9 [millimeter]," and that he was going "to get even with him." Officer Korzeniewski and Inglese also discussed a gun with a laser sight about which Officer Korzeniewski asked, "If I point the gun at somebody's stomach, it will hit them in the chest?" Inglese replied, "Yeah." Inglese then began filling out a sales receipt and asked Officer Korzeniewski what his occupation was. Officer Korzeniewski responded that he "hung out in the streets," but told Inglese to put down "sales." Inglese wrote "sales" as "Czaja's" occupation and "target shooting" as his purpose for buying the guns on the sales receipt, even though he and Officer Korzeniewski had never discussed target shooting.

Officer Korzeniewski returned to B & H on August 14, 2000 to pick up his guns. He was accompanied by undercover Chicago Police Officer Bernard Kelly, who portrayed FOID cardholder "Pete Cooney." When Inglese presented Officer Korzeniewski with one black 9-millimeter gun and one gray and black 9-millimeter gun, Officer Korzeniewski replied, "I wanted two shiny identical guns, so when I draw down, they will know it's me, they'll know I mean business." Inglese agreed to sell Officer Korzeniewski four Lorcin 9-millimeter guns instead.

Officer Korzeniewski also testified that on August 14, Officer Kelly told Inglese that he needed a gun "for his girls" because "they were getting ripped off and needed protection." Inglese agreed to sell Officer Kelly two Jennings .22 caliber pistols. The two officers then left B & H with the four Lorcin 9-millimeter guns.

Officer Kelly testified to the following: On August 19, 2000, he and Chicago Police Officer Robert McClain went to B & H. Officer Kelly portrayed FOID cardholder "Pete Cooney," and Officer McClain portrayed non-FOID

cardholder "Jeff." When they arrived, Inglese told them that "Ron" had just been in the store--referring to Officer Korzeniewski. Officer Kelly responded that "Ron" owed him some money and that he "got to get a Tec for his ass." Officer Kelly then agreed to purchase an Intratec 9-millimeter gun ("Tec-9"). Officer Kelly testified that based on his experience, the Tec-9 was popular with drug dealers. On the sales receipt, Inglese wrote that "Cooney's" purpose in making the purchase was "target shooting," even though he and Officer Kelly had not discussed target shooting. Inglese also wrote that "Cooney's" occupation was "laborer." The officers then left the store with the two .22 caliber pistols that Officer Kelly had agreed to purchase on August 14.

Officer Kelly testified that he and Officer McClain went to B & H again on September 9, 2000. While there, Inglese asked Officer McClain if he had obtained an FOID card, to which Officer McClain responded that he could not obtain one "for a bunch of reasons." Inglese then handed Officer McClain a Calico semi-automatic rifle and explained to him how it worked. Officer McClain told Inglese that he wanted to purchase the gun. Officer Kelly also told Inglese that he wanted to purchase a Beretta .45 caliber gun. Officer McClain paid the deposit for both guns. Because Officer McClain did not have an FOID card, however, Officer Kelly signed the sales receipt. Therefore, Inglese performed the background check on "Cooney" (the name on Officer Kelly's FOID card) rather than on Officer McClain's undercover identity.

Officer Kelly testified that when he and Officer McClain returned to B & H a few days later, Inglese again asked Officer McClain if he had obtained an FOID card. Officer McClain responded that he had not and that therefore "Cooney" would be handling all of the paperwork. When Inglese presented the bill for the Calico rifle and Beretta .45 caliber handgun, Officer Kelly told Officer McClain to pay for the Calico rifle, as that was his gun and not Officer Kelly's. Officer McClain then took out $500 from his pocket (the remaining balance on the Calico rifle) and handed it to Inglese. Officer Kelly paid for the remaining balance on the Beretta .45 caliber gun. Officer Kelly

also testified that when he filled out the ATF Forms for the two guns he and Officer McClain purchased that day, he indicated that "Cooney" was the actual buyer of both guns, which was false because Officer McClain was the actual buyer of the Calico rifle.

Officer Kelly also testified about events that provided the basis for two of the four straw purchase counts against Baumhardt. On September 17, 2000, he and Officer McClain went to B & H. Howard Zelenka (the co-owner of B & H) asked Officer McClain if he had received his FOID card yet, to which Officer McClain testified that he had not. This conversation took place in Baumhardt's presence. Baumhardt showed Officer McClain a .40 caliber gun, and Officer McClain agreed to purchase this gun. Officer Kelly agreed to purchase two different guns. When Baumhardt was preparing the sales receipt for these three guns, Officer Kelly told Officer McClain to give him money for the gun that Officer McClain was purchasing. When Officer McClain reached into his pocket and took out several hundred dollars, Baumhardt asked Officer Kelly if he was just borrowing that money, or if Officer McClain was paying for some of the guns. Before Officer Kelly could answer the question, Baumhardt walked away from the two officers and answered the phone. When Baumhardt returned, Officer McClain handed Baumhardt $600 (the amount of the deposit for all three guns). Officer Kelly then signed the sales receipt. Officer Kelly also testified that Baumhardt wrote "laborer" as "Cooney's" occupation and "target shooting" as his purpose for purchasing the guns.

On September 21, 2000, when Officers Kelly and McClain returned to B & H to pick up the three guns that they had ordered on September 17, Inglese was at the store, but Baumhardt was not. Inglese brought the officers their guns, and Officer Kelly paid the balance on the guns. Officer Kelly testified that he filled out the ATF Form for these purchases and indicated that he was the actual buyer of all three of the guns, and that Inglese signed the ATF Form and completed the A & D Book entry. Officer Kelly also testified that the information he provided on the ATF Form was erroneous because Officer McClain was the actual

buyer of one of the .40 caliber guns. Officer McClain also testified at trial and corroborated Officer Kelly's testimony in full.

The government's next witness was Yolanda Webb, who testified pursuant to a grant of immunity. Webb testified about several straw purchases that she engaged in with her boyfriend Andre Smith. Smith could not obtain an FOID card and asked Webb to obtain a card and purchase guns for him. Therefore, Webb obtained a valid FOID card and went to B & H on several occasions with Smith. For example, on September 16, 2000, Webb and Smith went to B & H and were helped by Baumhardt. Smith pointed out two guns that he wanted and asked Webb to ask Baumhardt how much they cost. After Baumhardt told her the price of the guns and the amount of the deposit, Smith reached into his pocket and took out the amount of money for the deposit. While Baumhardt was watching them, Smith then handed the money to Webb, who immediately handed it to Baumhardt. Webb testified that Baumhardt then filled out a sales receipt for the guns, using the information on Webb's FOID card. The sales receipt indicated that Webb's purpose for buying the guns was "target shooting," even though she and Baumhardt had never discussed target shooting. Webb testified that a few days later, she and Smith returned to B & H to pick up the guns and were assisted by Baumhardt again. Baumhardt asked Webb to fill out an ATF Form and asked for payment. Smith then took money out of his pocket and gave it to Webb, who immediately gave the money to Baumhardt.

Both Inglese and Baumhardt also testified at trial. They claimed that virtually everything the three officers and Webb had said when they testified was false. For example, Inglese testified that on September 16 and 19, Webb had come into B & H alone, had picked out the guns herself, and had paid for the guns with money that she had taken out of her purse. Further, he testified that when Officer Korzeniewski came into B & H on August 10, he told Inglese that he wanted guns that he could use for target shooting and that he never mentioned anything about getting "ripped off" or needing to get even with someone who "ratted him out." Inglese also testified that on August 14, Officer Kelly told him

that he was a "construction laborer" and that he never said anything about needing a gun to "protect his girls." He also denied that Officer Kelly told him that he was going to get a "Tec for [Czaja's] ass," or that Officer McClain ever paid for guns for which "Cooney" was the actual buyer. Finally, Inglese testified that there was nothing suspicious about the purchases that Officers Korzeniewski or Kelly made, and that if he had heard any of the comments that the officers claimed to have made, he would have terminated the sales.

Baumhardt testified that on September 16, Webb came into the store alone, picked out the guns that she wanted, and paid for them with money that she took out of her purse. He also testified that on September 19, he was not in the store and did not complete the bottom of the ATF Form or the A & D Book entry for her purchase. When shown the ATF Form for Webb's September 16 and 19 purchase, he testified that the signature on the ATF Form was Inglese's. Baumhardt also denied seeing or hearing anything suspicious concerning the purchases made by Officers Korzeniewski or Kelly.

After the close of the evidence and closing arguments, the district court instructed the jury. Because each of the crimes that Inglese and Baumhardt were charged with had a mens rea requirement of "knowing" behavior, the district court instructed the jury on what this meant and gave the following instruction (the "ostrich instruction"):

When I use the word "knowingly" or the phrase the defendant "knew" as used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct and by all of the facts and circumstances surrounding the case.

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly

as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

The jury convicted Inglese of the eight counts associated with his participation in four straw purchases and convicted Baumhardt of the four counts associated with his participation in two straw purchases. The jury acquitted Inglese on the drug trafficking counts.

C.  Sentencing

The district court sentenced Baumhardt to 15 months imprisonment to be served concurrently on each of the four counts for which he was found guilty. The district court sentenced Inglese to 30 months imprisonment to be served concurrently on each of the eight counts for which he was found guilty. In sentencing Inglese, the district courtincreased his offense level by four levels pursuant to United States Sentencing Guideline sec. 2K2.1(b)(5). That Guideline applies to a defendant who "transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. sec. 2K2.1(b)(5).

II.  Analysis

Inglese and Baumhardt raise the following issues on appeal: 1) It was reversible error for the district court to give the ostrich instruction; 2) the district court abused its discretion in admitting certain evidence at trial; 3) the district court erred in applying Sentencing Guideline sec. 2K2.1(b)(5) to Inglese's sentence; 4) the district court violated Baumhardt's right to conflict-free counsel; and 5) there was insufficient evidence to support Baumhardt's conviction.

A.  Ostrich Instruction

Inglese and Baumhardt contend that the district court erred in giving the ostrich instruction to the jury. However, because neither of them objected to the instruction at trial, they have forfeited this argument on appeal, and we review for plain error. See, e.g., United States

v. Griffin, 84 F.3d 912, 924-25 (7th Cir. 1996). Under plain error analysis, the defendants must show the following: 1) that the district court committed an error; 2) that the error was clear or obvious; and 3) that the error affected substantial rights. See, e.g., United States v. Olano, 507 U.S. 725, 732-34, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). Thus, we must first determine whether the district court erred in giving the ostrich instruction. See id. at 732-33. When addressing such a claim, this court views the evidence in the light most favorable to the government. See United States v. Craig, 178 F.3d 891, 896 (7th Cir. 1999).

An ostrich instruction informs the jury that actual knowledge and the deliberate avoidance of knowledge are the same thing. See id. The district court may give an ostrich instruction "where the defendant is prosecuted under a criminal statute with a 'knowingly' mens rea component, and he or she claims [1] a lack of guilty knowledge and [2] there are facts and evidence that support an inference of deliberate ignorance." United States v. McClellan, 165 F.3d 535, 549 (7th Cir. 1999) (quotation omitted). At trial, Inglese and Baumhardt clearly claimed that they did not know that the police officers and Webb engaged in straw purchases. Therefore, we focus on whether there was sufficient evidence that they were deliberately ignorant of this fact to justify the ostrich instruction. Deliberate ignorance may be established by "overt, physical acts as well as by purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will." Craig, 178 F.3d at 896 (quotation omitted).

For example, in United States v. Wilson, 134 F.3d 855, 858 (7th Cir. 1998), the defendant was convicted of possessing cocaine with the intent to distribute. The government alleged that at a co-defendant's direction, the defendant knowingly loaded a van with several large trash bags full of cocaine, drove the van to a nearby street, parked it, left the keys inside, and watched someone drive the van away. See id. at 868. At trial, the defendant admitted that those facts were true, but testified that he was not aware that the trash bags contained cocaine. See id. The district court found

that the defendant was faced with suspicious circumstances--for example, being asked to load large trash bags into a van and to leave the van in the street with the keys inside of it. See id. Because the defendant failed to ask follow-up questions or take any other action in the face of these suspicious circumstances, the district court gave an ostrich instruction to the jury. See id. We affirmed, holding that the defendant's testimony denying knowledge in the face of suspicious circumstances was sufficient to justify the ostrich instruction. See id.; see also Craig, 178 F.3d at 897-98 (holding that defendant's "failure to ask questions that would certainly arise from the circumstances . . . is evidence that could lead a jury to determine" that the defendant deliberately avoided learning the truth) (citation omitted).

   In the present case, the record is replete with evidence for the jury to conclude that both Inglese and Baumhardt were deliberately ignorant. For example, Officers Kelly and McClain both testified that they told Inglese and Baumhardt that Officer McClain did not possess an FOID card, but on several occasions, Officer McClain paid for guns that were purportedly being purchased by Officer Kelly. Further, Webb's testimony indicated that Smith pointed out certain guns, directed Webb to ask questions about these guns, and paid for the guns, even though Webb filled out the paperwork. Finally, Officer Korzeniewski testified that he made several self-incriminating comments, such as that he was going to get even with whomever ratted him out, and that Inglese still put down "sales" as his occupation on the paperwork. In the face of these suspicious circumstances, Inglese and Baumhardt did not ask any follow-up questions or take any action to find out whether straw purchases were occurring. In fact, Inglese testified that as long as the FOID cardholder told him that the guns were for him, he would not ask any follow-up questions. Thus, as in Wilson and Craig, Inglese and Baumhardt's failure to take any action in the face of the suspicious circumstances that were presented to them warranted the giving of an ostrich instruction.

B.  Evidentiary Issues

Next, Inglese and Baumhardt contend that the district court made several erroneous evidentiary rulings that require reversal of their convictions. All of their evidentiary arguments are meritless and warrant minimal discussion. First, they argue that the district court admitted inadmissible hearsay when Webb testified that her boyfriend Smith told her that he had been in jail, that he was a member of the Gangster Disciples street gang, and that he was unable to obtain an FOID card. We hold that the district court did not abuse its discretion in ruling that this evidence was not hearsay, as it was offered for the effect it had on the listener--to explain why Webb went to B & H to purchase guns for Smith. See, e.g., United States v. Linwood, 142 F.3d 418, 425 (7th Cir. 1998) (holding testimony was not hearsay where offered to show its effect on witness).

Next, Inglese and Baumhardt assert that the district court admitted unduly prejudicial evidence when it allowed Officer Kelly to testify that Tec-9 guns were popular with drug dealers. This evidence was relevant to the drug trafficking counts as it tended to show that Inglese sold firearms that he knew were going to be used in the commission of a drug trafficking crime. Further, this evidence was relevant to the straw purchase counts as it tended to show that when Inglese and Baumhardt put down "sales" and "laborer" as the undercover officers' occupations on the paperwork, they knew that this information was erroneous. The district court did not abuse its discretion in finding that any prejudice stemming from the admission of this evidence did not substantially outweigh its relevance. See United States v. Medina, 755 F.2d 1269, 1274 (7th Cir. 1985) (noting that district court's determination on this issue is afforded "great deference").

Inglese and Baumhardt also allege that the government improperly referred to certain guns as "machine pistols" and "military-style assault rifles" in its opening statement. Without citing any authority, they allege that the use of these terms was "highly inflammable" because the government used these terms in connection with guns that were not technically machine guns or assault

rifles. Because neither defendant objected to the use of these terms, we review for plain error. See Griffin, 84 F.3d at 924-25. The district court instructed the jury that opening statements were not evidence. We have no reason to believe that the jury improperly relied on these statements, and the defendants have offered nothing to suggest otherwise. See, e.g., United States v. Saadeh, 61 F.3d 510, 521 (7th Cir. 1995). Therefore, the district court did not commit plain error by failing to strike these references.

Finally, Inglese and Baumhardt argue that the government's closing argument was improper because it said that Inglese offered to sell Officer Kelly a "machine gun" and there was no evidence of that fact. Defense counsel objected to the use of the term "machine gun," and the district court sustained this objection. Even if the government's comment was improper, because Inglese and Baumhardt received the relief that they requested, there is no adverse ruling about which they can complain. See United States v. Whitaker, 127 F.3d 595, 606-07 (7th Cir. 1997) (holding that government's improper comment during closing argument was not reversible error where the district court sustained defendant's objection to the comment). Further, given the totality of the circumstances, the government's comments did not have the inflammatory impact necessary to warrant a reversal. See id.

C.   Sentencing Enhancement

Inglese's next argument is that the district court improperly enhanced his sentence under U.S.S.G. sec. 2K2.1(b)(5). That Guideline applies to any defendant who "transferred any firearm or ammunition with knowledge, intent, orreason to believe that it would be used or possessed in connection with another felony offense." Id. The district court found that Inglese had "reason to believe" that "one or more of [the] guns" that he sold to Officers Korzeniewski or Kelly "would be used in the commission of a felony." We review this finding for clear error. See United States v. Jemison, 237 F.3d 911, 918 (7th Cir. 2001).

In Jemison, the defendant planned to

sell ten guns that he purchased from an Illinois gun store to members of the Gangster Disciple street gang. See id. at 913. The district court found that the defendant "had reason to believe" that the guns would be used for felonious activities and enhanced the defendant's sentence by four levels pursuant to U.S.S.G. sec. 2K2.1(b)(5). See Jemison, 237 F.3d at 915. On appeal, the defendant argued that the district court erred in enhancing his sentence because the government did not show that he "had reason to believe that the [guns] would be used in a specific offense in the future." Id. at 918 (quotation omitted) (emphasis added). We affirmed the sentencing enhancement even though the district court made no findings regarding whether the defendant knew which of the ten guns he sold would be used to commit a felony or which specific felony the gang members would commit. See id. We held that the defendant "had reason to believe" that the guns he sold would be used to commit a felony because the Gangster Disciples were "an infamous nationwide criminal organization" and because of the connection between street gangs and felonies. Id.

In our case, there is ample evidence to suggest that Inglese "had reason to believe" that at least one of the guns he sold to the undercover police officers would be used to commit a felony. U.S.S.G. sec. 2K2.1(b)(5). For example, Officer Kelly told him that he needed to buy a Tec-9 with which to shoot Czaja. Further, Officer Korzeniewski told him that he needed to buy guns in order to get even with the person who ratted him out to the police. He also told Inglese that he wanted identical guns "so that when [he draws] down, they would know it's [him], they'll know [he] mean[s] business." Finally, he asked Inglese, "if I point the gun at somebody's stomach, it will hit them in the chest?" These comments clearly gave Inglese "reason to believe" that the undercover police officers would commit felonies with the guns that they purchased from B & H. U.S.S.G. sec. 2K2.1(b)(5). That the district court did not make specific findings regarding whether Inglese knew which guns would be used to commit which felonies is irrelevant. See Jemison, 237 F.3d at 918.

D.  Conflict-Free Counsel

On appeal, Baumhardt argues that he received ineffective assistance of counsel because his trial counsel was not "free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1980). However, Baumhardt has waived the right to raise this issue on appeal. At trial, Joel Ostrander represented both Baumhardt and B & H but not Inglese. The government filed a motion to disqualify Ostrander from his joint representation because Baumhardt and B & H appeared to have conflicting interests. In response, Ostrander claimed that both of his clients wished to waive their right to conflict-free counsel and had signed a waiver to that effect. The waiver form indicated that Baumhardt had discussed this issue with Ostrander, that he understood the potential conflict, that he understood his Constitutional rights, and that he wished to waive any potential conflicts of interest and remain represented by Ostrander. More importantly, Baumhardt averred: "I understand that this waiver of conflict-free counsel includes the waiver of my right to claim ineffective assistance of counsel on this ground, either on appeal or in any post-conviction proceeding."

After reviewing the waiver form, the district court engaged in the following colloquy with Baumhardt:

The Court: Mr. Baumhardt, did you read the motion [to disqualify Ostrander]?

Baumhardt: Yes sir.

The Court: Do you understand what the problem is?

Baumhardt: Yes sir.

The Court: Real or imaginary?

Baumhardt: Yes sir.

The Court: Did you discuss it with Mr. Ostrander?

Baumhardt: Yes sir.

The Court: Did you discuss it with anyone else?

Baumhardt: No sir.

The Court: Did you discuss it with Mr. Zelenka [the co-owner of B & H]?

Baumhardt: No sir.

The district court then accepted the waiver and denied the government's motion.

On appeal, Baumhardt contends that his appellate waiver should not be enforced. However, we have held that appellate waivers are enforceable if made knowingly and voluntarily and if not amounting to empty promises. See United States v. Williams, 184 F.3d 666, 668 (7th Cir. 1999); United States v. Wegner, 58 F.3d 280, 281-82 (7th Cir. 1995). "Most waivers are effective when set out in writing and signed." Wegner, 58 F.3d at 282. In Wegner, the defendant entered into a written plea agreement, one provision of which stated: "I expressly waive any and all rights . . . to appeal my sentence." Id. at 281. We held that the appellate waiver was enforceable because it was made knowingly and voluntarily, as evidenced by the fact that the waiver provision was express, was in writing, and was signed by the defendant. See id. Further, we noted that the defendant had bargained for a benefit (the prosecutor's recommendation for a more lenient sentence) in exchange for a detriment (a guilty plea and an appellate waiver), and after receiving his bargained-for benefit, the defendant was merely seeking to repudiate his part of the deal. See id. at 282-83.

As in Wegner, Baumhardt's appellate waiver was express ("I understand that this waiver of conflict-free counsel includes the waiver of my right to claim ineffective assistance of counsel . . . on appeal.") was in writing and was signed by Baumhardt. Further, the waiver form and colloquy conducted by the district court indicate that Baumhardt's waiver was voluntary and knowing and was not an empty promise. Therefore, as in Wegner, we hold that Baumhardt's appellate waiver is enforceable.

E. Insufficiency of the Evidence

Baumhardt's last argument on appeal is that the evidence was insufficient for the jury to convict him on two of the

straw purchase counts, which charged that he "knowingly and willfully made and used, and caused to be made and used, false writings and documents." 18 U.S.C. secs. 2, 1001(a)(3) (emphasis added). These two counts related to the alleged straw purchases that took place at B & H on September 16 and 19 with Webb and on September 17 and 21 with Officer Kelly. We may overturn the jury verdict "only if the record contains no evidence from which the jury could have found guilt beyond a reasonable doubt." United States v. Viezca, 265 F.3d 593, 597 (7th Cir. 2001) (quotation omitted). In addition, in assessing Baumhardt's claim, we view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor. See id.

Baumhardt does not dispute that there was sufficient evidence to implicate him in the front-ends of the September 16 and 17 transactions. Rather, he argues that because he did not complete the ATF Forms and A & D Book entries for these purchases, the convictions on these two counts cannot lie. Baumhardt's argument, however, ignores the language of the indictment and the jury instructions. The indictment charged that Baumhardt "knowingly and willfully made and used, and caused to be made and used, false writings and documents." 18 U.S.C. secs. 2, 1001(a)(3) (emphasis added). Further, the jury instructions stated that a "statement or entry is fraudulent if known to be untrue and made or caused to be made with intent to deceive." (emphasis added). Therefore, even if Baumhardt did not complete the ATF Forms and A & D Book entries for these purchases, he could be convicted if the evidence showed that he "caused" these false entries to be completed.

Officers Kelly and McClain both testified that on September 17, Baumhardt heard Officer McClain say that he did not have an FOID card and saw Officer McClain pay for some of the guns even though Officer Kelly was the purported actual buyer. Further, they testified that Baumhardt filled out the sales receipt for these purchases and indicated that Officer Kelly's occupation was "laborer" and his purpose for buying the guns was "target shooting." Webb testified that on September 16, she and Smith, who did not possess an FOID card, went to B & H.

Smith pointed out two guns that he wanted and asked Webb to ask Baumhardt how much they cost. After Baumhardt told her the price of the guns and the amount of the deposit, Smith reached into his pocket and took out the amount of money for the deposit. While Baumhardt was watching them, Smith then handed the money to Webb, who immediately handed it to Baumhardt. Webb testified that Baumhardt then filled out a sales receipt for the guns, using the information on Webb's FOID card. The sales receipt indicated that Webb's purpose for buying the guns was "target shooting," even though she and Baumhardt had never discussed target shooting.

The evidence showed that Baumhardt created the sales receipts in Officer Kelly's and Webb's names with knowledge that they were not the actual buyers. The completion of the sales receipts was a critical step towards the completion of the straw purchases because the B & H employee would do the background check on the name that appeared on the sales receipt. Moreover, the entries on the ATF Forms and in the A & D Books would be made from the information contained in the sales receipts. Thus, because the evidence clearly showed that Baumhardt created the sales receipts with knowledge that they contained false information, there was sufficient evidence for a rational juror to find that he "caused" false ATF Forms and A & D Book entries to be made.

III.  Conclusion

For the foregoing reasons, we AFFIRM.

FOOTNOTES

/1 18 U.S.C. sec. 1001(a)(3) provides:

"[W]hoever . . . makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title or imprisoned not more than 5 years, or both."

/2 18 U.S.C. sec. 922(b)(2) provides:

It shall be unlawful for any . . . licensed dealer . . . to sell or deliver any firearm to any person in any State where the purchase or possession by such person of such firearm would

be in violation of any State law . . . unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law.